IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 2-279 T

(Chief Judge Edward J. Damich)

PENNZOIL-QUAKER STATE COMPANY AND SUBSIDIARIES, SUCCESSOR TO QUAKER STATE CORPORATION AND SUBSIDIARIES,

Plaintiff

v.

UNITED STATES,

Defendant

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PETER A. LOWY
910 Louisiana St.
Suite 4396
Houston, Texas 77002
(713) 241-4755 (telephone)
(713) 241-2162 (facsimile)

Attorney for Plaintiff

# TABLE OF CONTENTS

INDEX TO APPENDIX....................iii

TABLE OF AUTHORITIES....................iv

QUESTIONS PRESENTED....................1

STATEMENT OF THE CASE....................2

ARGUMENT....................11

I. Standard of Review....................11

II. The IRS Audit Findings Establish That There Is No Genuine Issue of Material Fact And Quaker State Is Entitled To Judgment As a Matter of Law....................13

III. The IRS Is Correct That Quaker State Overstated its 1997 Federal Income Taxes in The Amount Of $1,907,545....................15

A. Introduction to the ACE Adjustment....................15

B. Quaker State's ACE Adjustment Should Reflect A Negative $6,319,418....................17

C. Because Quaker State Was Not Subject To The AMT, Quaker State Is Entitled To A Refund Of The AMT Payment And May Claim Certain Tax Credits Not Previously Taken....................19

III. The IRS Correctly Concluded That Quaker State Overstated Its 1996 Federal Income Taxes In The Amount Of $254,401....................20

A. Quaker State Is Entitled To A $663,000 Deduction Due To Marking to Market Its Accounts Receivable....................20

B. Quaker State Is Entitled To $22,426 In Empowerment Zone Employment Credits....................23

C. The Mark To Market Deduction and the Empowerment Zone Credits Result In A $254,401 Overstatement Of Quaker State's 1996 Federal Income Taxes....................23

II. Defendant's Alleged Offsets Are Without Basis In Law Or Fact And Thus Defendant Cannot Offset Quaker State's Overpayment..............24

A. The §453A Installment Sale Offset Is Without Merit and Cannot Survive Summary Judgment....................25

B. There Are No Other Offsets Or Other Issues That Stand In The Way of Summary Judgment Or Otherwise Remain Relevant to These Proceedings....................27

V. The Court Should Not Delay Its Decision On This Motion On Account Of Defendant's Plea That It Needs More Time To Develop The Issues....................30

CONCLUSION....................33

# INDEX TO APPENDIX

Affidavit of Kenneth Krch....................A3

Form 4549 (IRS Report)....................A6

Affidavit of Valerie Sutton....................A37

Exhibit AA (Quaker State $2 Million Refund Spreadsheet)....................A41

Exhibit BB (Quaker State 1996-1998 Computational Recap)....................A45

Form 870 and JCT Worksheet....................A48

Form 1139 (NOL Carryback)....................A52

Declaration of Peter A. Lowy....................A130

IRS Form 5701 (1994-1995)....................A133

IRS 1996-1998 Transcripts....................A134

IRS Forms 5701 (1996-1998)....................A140

# TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................12

*Brubaker Amusement Co. v. U.S.*, 304 F.3d 1349 (Fed. Cir. 2002), *cert. denied sub nom. Penn Triple S v. U.S.*, 538 U.S. 921 (2003).................12,30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....12

*Mahoney v. U.S.*, 223 Ct. Cl. 713 (1980)..........................................24,26,28

*New America Shipbuilders, Inc. v. U.S.*, 871 F.2d 1077 (Fed. Cir. 1989)....12

*Theisen Vending Co. v. U.S.*, 58 Fed. Cl. 194 (2003)............................12, 30

*United States v. Commercial Nat. Bank,* 874 F.2d 1165 (7th Cir. 1989)......29

*Welch v. Helvering*, 290 U.S. 111 (1933)...................................................29

STATUTES

26 U.S.C. §38..........................................................................................23

26 U.S.C. §172..........................................................................................3

26 U.S.C. §453A...................................................................................25-26

26 U.S.C. §475.....................................................................................20-22

26 U.S.C. §6501........................................................................................4

26 U.S.C. §6405........................................................................................8

MISCELLANEOUS

26 C.F.R. §1.56(g)-1(a)(2)...................................................................17-18

Mertens, LAWS OF FEDERAL INCOME TAXATION, §2A:109..........................16

## QUESTIONS PRESENTED

1) Whether the Internal Revenue Service's audit adjustments that result in an overpayment of Quaker State's Federal income taxes in the amounts of $254,401 for 1996 and $1,907,545 for 1997 are correct.

a) Whether deductions for the 1996 tax year should be increased by $663,000, due to marking to market certain accounts receivable under §475.

b) Whether Quaker State's Form 1139 contained computational errors that overstated its tax liability in the amounts of $22,426 for the 1996 tax year and $1,907,545 for the 1997 tax year.

i) Whether empowerment zone employment credits for the 1996 tax year should be increased by $22,426.

ii) Whether alternative minimum tax for the 1997 tax year should be decreased by $1,195,092, as well as a corresponding decrease of $100,000 due to recomputation under regular tax rates.

iii) Whether empowerment zone employment credits for the 1997 tax year should be increased by $183,325.

iv) Whether fuel credits for the 1997 tax year should be increased by $429,128.

2) Whether Defendant is entitled to offset Quaker State's overpayment for its 1996 and/or 1997 tax years on grounds that under §453A(c) it underpaid interest in connection with an installment sale, in light of Defendant's failure to raise this issue in Part I of this litigation or to come forward with any evidence supporting an offset.

3) Whether Defendant is entitled to delay resolution of Quaker State's summary judgment motion to conduct additional discovery pursuant to Rule 56(f), even though Defendant has already had five years to request information from Quaker State relating to the refunds at issue, and even though Quaker State fully cooperated with Defendant during all relevant times.

## STATEMENT OF THE CASE

This is an action to recover Federal income taxes including $254,401 for tax year 1996 and $1,907,545 for tax year 1997, which the IRS, after an approximately two-year audit, agreed should be refunded to Quaker State.[1]

## I. Background

Quaker State was formed as a Delaware corporation in 1931 and engaged in petroleum operations, coal operations and other energy-related activities during the years in issue. During these years, the company was perhaps best known for its brand name cans of motor oil that bear the Quaker State logo and are sold at gas stations, and for other products such as Slick 50 engine treatment, Rain-X windshield protection, as well as its Q Lube service stations that provide oil changes and other automotive services.

Each year, in the course of Quaker State's business, Quaker State enters into many transactions, probably hundreds of thousands, and reports the tax consequences of these transactions on its Federal income tax returns. For its 1996 and 1997 taxable years, which are the years in issue here, Quaker State timely filed its Federal income tax returns to report the many transactions pertinent to those years. On its original 1996 Federal income

[1] In addition to these amounts, the parties have stipulated in connection with the Court's Opinion on the §1341 issue, filed October 28, 2004, that Quaker State is entitled to $111,392 for 1995 and $112,621 for 1996. Note also that the tax years in issue pre-date Quaker State's combination with Pennzoil, so this brief refers to the taxpayer as Quaker State, even though Pennzoil-Quaker State is technically the captioned party.

tax return, Quaker State reported and paid a tax liability of $11,802,400. A63. On its original 1997 Federal income tax return, Quaker State reported and paid a tax liability of $21,347,369. A94; A97. After filing its 1996 and 1997 tax returns, however, Quaker State determined, based on subsequent events and analysis, that its tax liability was less than it had originally reported.

The most significant reduction came from an $88,176,435 net operating loss ("NOL") that Quaker State incurred in 1998.[2] A54. Under 26 U.S.C. §172, Quaker State was entitled to "carry back" the NOL from 1998 to tax years 1996 and 1997. In August 1999, Quaker State filed Form 1139, which is the applicable form to claim an NOL carryback. *Id.* Quaker State's Form 1139 claimed that the NOL from 1998 entitled it to deductions for its 1996 and 1997 tax years in the amounts of $37,059,862 and $51,116,573, respectively, which resulted in an overpayment in taxes in the amounts of $10,604,461 for tax year 1996 and $16,747,344 for tax year 1997. A54; A62; A94. Quaker State requested that these amounts be refunded.

The IRS made tentative refunds of these amounts (i.e., the IRS paid Quaker State the refunds it claimed, subject to a follow-up audit). A12.

[2] An NOL is a bottom line number on the tax return, i.e., when all of the gross income, deductions, etc., are taken into consideration, the taxpayer has a loss, rather than positive taxable income, under income tax accounting principles.

During the follow-up audit, which lasted about two full years, the IRS determined that the $88,176,435 NOL was correct, that Quaker State was entitled to reduce its tax liability on account of the $37,059,862 and $51,116,573 NOL deductions it claimed, and that Quaker State was entitled to the corresponding refunds for 1996 and 1997 in the amounts of $10,604,461 and $16,747,344.[3] A12; A54.

## II. The IRS Audit Also Revealed That Quaker State Was Entitled To Receive Additional Refunds

During the audit described above, in addition to upholding the NOL carryback refunds, the IRS further determined that Quaker State should receive an additional refund of $254,401 for 1996 and $1,907,545 for 1997, due to other items relevant to 1996 and 1997 tax years that were discovered during the audit. A6. The following chart illustrates these additional adjustments and how they break down to comprise the refund that the IRS determined:[4]

[3] Having made its determination, the IRS allowed the period during which it could recoup the refund to expire. In general, the IRS has three years to assess taxes (i.e., increase the tax liability of the taxpayer) and two years from the time it makes a refund to bring an action in district court to recover the refund if erroneously made. *See* 26 U.S.C. §6501(h); §6532(b). Both limitation periods, including extensions, have now expired, even after Quaker State agreed to multiple extensions of the three-year period, until the IRS was satisfied that it had completed its review and analysis. A138-139.

[4] This chart is basically a copy of the chart on page 8 of the Form 4945-A ("IRS Report"), which is attached in the Appendix at A13.

| Tax Year | 1996 | 1997 |
|---|---|---|
| 1. §475 Deduction | **232,050*** | |
| 2. EZE Credits | **22,426** | **183,325** |
| 3. Fuel Credits | | **429,128** |
| 4. AMT | (75) | **1,195,092** |
| 5. Tax Rate Adj. | | **100,000** |
| Total | 254,401 | 1,907,545 |

* This is a $663,000 deduction that has a $232,050 tax effect.

As explained briefly below and in greater detail later, these refunds resulted exclusively from computational errors on the Form 1139, except the $232,050, which is a deduction claimed on Form 1120X, which Quaker State filed before filing the Form 1139. These miscalculations resulted from the mistaken belief that the Alternative Minimum Tax ("AMT") required it to make certain payments and prevented it from claiming certain credits.

1996 Tax Year

As the chart illustrates, for tax year 1996, the IRS determined Quaker State was entitled to $22,426 of empowerment zone employment credits that the Form 1139 had mistakenly shown as being limited by the AMT. A13. As a result, Quaker State should have but did not claim this $22,426 credit

on the Form 1139. The IRS also determined that Quaker State was entitled to a mark-to-market deduction having a tax reduction effect of $232,050.[5] A11. Together, after including an increase to AMT in the amount of $75, which Quaker State does not dispute, these adjustments result in an overpayment of $254,401 for the 1996 tax year. A6; A13.

<u>1997 Tax Year</u>

As the chart also illustrates, for the 1997 tax year, the IRS determined that Quaker State is entitled to adjustments for $1,195,092 of AMT that it did not owe, additional tax credits of $183,325 and $429,128, as well as a computational adjustment of $100,000 when the tax rates are applied under the regular tax, rather than the AMT. A13-15.

The IRS concluded that Quaker State is owed these amounts because it was not subject to the AMT in 1997. A13-15. When Quaker State filed its Form 1139, it mistakenly left blank a component of the AMT known as the ACE adjustment, which erroneously placed Quaker State in an AMT position. A14-18. Consequently, Quaker State erroneously paid AMT in the amount of 1,195,092 and computed credit limits and tax rates under the AMT rather than the regular tax. Correcting the ACE, the IRS determined,

[5] This deduction was claimed on a separate Form 1120X, filed prior to the Form 1139. Note that unlike the tax credit, which reduces Quaker State's tax liability dollar for dollar, the additional mark-to-market deduction reduces the tax liability through a reduction in taxable income; here, a $663,000 mark to market deduction results in $232,050 tax savings.

removes Quaker State from the AMT and reverses the errors shown in the chart above. A13.

*Note*: All of the adjustments shown on the above chart for the 1996 and 1997 tax years would reduce Quaker State's tax liability by the amounts shown in the chart, regardless of the correctness of the NOL deductions. *See* Sutton Affidavit at A41-42 (showing side by side computations, which demonstrate that the items in the chart reduce the tax liability with or without the NOL deductions). In other words, the correctness of the NOL calculation has no bearing whatsoever on the additional adjustments shown on the chart and claimed in this motion, which are entirely separate from and independent of the NOL. *See infra at pp. 26-28.*[6]

## III. Despite Admitting That These Refunds Should Be Paid, The IRS Has Delayed Paying These Refunds For Three Years With No Reasonable Explanation

At the conclusion of the audit, in August 2002, the IRS issued Form 4549-A ("IRS Report") reflecting the above refunds and computations. A6. The report states that Quaker State is entitled to all of the refunds identified in this motion. A6. At that time, the IRS also prepared and presented to Quaker State a Form 870 that verified the refunds as well as a worksheet for

[6] The only consequence of a decrease to the NOL deductions would be a decrease in other deductions (a new line would have to be added to the chart), which would decrease the Total, but would not alter the items presented here that result in independent reductions in tax liability.

submittal to the Joint Committee on Taxation ("JCT Worksheet"), showing the refunds of $254,401 for 1996 and $1,907,545 for 1997. *See Form 870 and accompanying JCT Worksheet at* A48-51. Defendant led Quaker State to believe that the matter would be promptly submitted to the Joint Committee on Taxation, which must be given an opportunity to review refunds in excess of $2 million.[7]

But to the contrary, during Part I of this case (involving the §1341 issues), long after the audit had concluded, Defendant informed Plaintiff that the refund was never submitted to the Joint Committee on Taxation and would not be processed unless Quaker State submitted a "settlement offer." A131; *see also Transcript (6/27/03) at p.16*. Even though there was no disagreement that Quaker State was owed the $254,401 for 1996 and $1,907,545 for 1997, Quaker State nonetheless submitted a "settlement offer" in July 2003 for $254,401 for 1996 and $1,907,545 for 1997, to comply with the specifications of Defendant's counsel. A131. By letter dated July 30, 2003, Defendant confirmed that the settlement offer would be processed under Department of Justice procedures. *Id.*

[7] Pursuant to 26 U.S.C. §6405(a), when the IRS approves a refund in excess of $2 million, and such matter is not in a court of record, the Joint Committee on Taxation, which is a bicameral congressional committee (see www.house.gov/jct), must be given a 30-day opportunity to object to the refund. Such opportunity, however, is not necessary in the case of refunds from carryback deductions, for which the IRS need only submit a post-refund report. *See* §6405(b).

During the next two years, Defendant claimed it was considering and processing the settlement offer. A131-132. Quaker State regularly invited Defendant to discuss the settlement and asked if there was any additional information Quaker State could provide to facilitate the process. *Id.* Defendant did not request any information from Quaker State for about two years while the settlement offer was pending. In May 2005, and again three days before it filed its Answer, Defendant finally did make two requests for information. Quaker State responded to both requests within a reasonable period of time and provided the information sought, which continued to support and corroborate the refunds' correctness.[8]

In addition, throughout the two-year period while the settlement offer was pending, Quaker State repeatedly inquired about the status of the settlement offer review process. *Id.* While Defendant mostly left Quaker State in the dark, the few substantive communications that Quaker State did receive further confirm that Quaker State is entitled to the refunds claimed herein. In April 2004, Defendant's counsel informed Quaker State that the Department of Justice computation specialist agreed that the refunds were correctly computed. A132. Defendant's counsel also told Quaker State that

[8] There have been no allegations otherwise, nor any allegations that Quaker State has been uncooperative. In fact, in the Status Conference with this Court on August 2, 2005, Defendant verified that Quaker State had provided the information requested.

to expedite the refund process, the case would be transferred to the IRS for submittal to the Joint Committee on Taxation. A132. In September 2004, Defendant's counsel assured that the case was in fact submitted to the Joint Committee on Taxation. A132. Defendant made the same representation in several status reports to this Court. *See Status Report (1/10/05); Joint Status Report (11/9/04)*. Contrary to Defendant's representations, however, the case was never submitted to the Joint Committee on Taxation and instead remained within the IRS the entire time the settlement offer was pending. *See Transcript (4/13/05) at pp.7-9.*

**IV. Because The Administrative Process Has Failed, Quaker State Has No Choice But To Seek Relief From This Court**

Defendant's inexplicable delays and misrepresentations have left Quaker State no choice but to seek judicial relief. Defendant has had nearly five years to investigate the issues presented in this Motion. Not once during this entire time did Defendant ever suggest that Quaker State was not entitled to these refunds, and in fact, Defendant repeatedly admitted that the refunds are due and owing.

There is no genuine dispute that the refunds claimed in this motion are correct. The only question is whether Defendant should be afforded even more opportunity to delay the inevitable. Because there are no genuine

issues of material fact and no justification for further delay, Quaker State is entitled to summary judgment.

## ARGUMENT

After an extensive, two-year audit of Quaker State's Federal income tax returns for tax years 1996 and 1997, after which the IRS concluded that Quaker State is entitled to refunds of $254,401 for 1996 and $1,907,545 for 1997, and then another three years of reviewing these refunds, Defendant has found no evidence that raises a genuine issue of material fact as to the correctness of the refunds, and in fact has repeatedly admitted the refunds are due and owing. The Court therefore should enter summary judgment.

### I. Standard of Review

Under Rule 56, summary judgment "shall be rendered forthwith" if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c). Moreover, a party may move for summary judgment at any time after the expiration of sixty days from the commencement of the action. Rule 56(a). The party moving for summary judgment must come forward with evidence that supports each material fact necessary to its affirmative case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the non-moving party believes that it should be allowed discovery before the Court rules on a motion for summary judgment, the party must, in accordance with Rule 56(f), submit affidavits that specify: (1) the particular information sought; (2) how, if uncovered, the information would preclude summary judgment; (3) the factual basis for the non-movant's belief that such information exists; (4) the efforts previously made to obtain such information, and (5) why such information has not previously been obtained. *See, e.g., Brubaker Amusement Co. v. U.S.*, 304 F.3d 1349, 1361 (Fed. Cir. 2002), *cert. denied sub nom. Penn Triple S v. U.S.*, 538 U.S. 921 (2003); *New America Shipbuilders, Inc. v. U.S.*, 871 F.2d 1077, 1081 (Fed. Cir. 1989); *Theisen Vending Co. v. U.S.*, 58 Fed. Cl. 194, 198 (2003).

If the non-movant fails to demonstrate a compelling reason for discovery, the non-movant must produce significant probative evidence demonstrating a genuine issue on one or more material facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant does not meet this burden, then the Court must grant summary judgment. *See Anderson*, 477 U.S. at 249.

## II. The IRS Audit Findings Establish That There Is No Genuine Issue of Material Fact And Quaker State Is Entitled To Judgment As A Matter of Law.

Unless Defendant, in its opposition, produces significant probative evidence refuting the IRS's findings contained in the IRS Report (A6), summary judgment should be granted. The IRS Report admits that Quaker State is entitled to refunds in the amounts of $254,401 for 1996 and $1,907,545 for 1997, and provides a cogent and detailed analysis to support its findings.

The IRS explains that the following items result in a refund to Quaker State:

| Tax Year | 1996 | 1997 |
|---|---|---|
| 1. Deductions | **232,050** | |
| 2. EZE Credits | **22,426** | **183,325** |
| 3. Fuel Credits | | **429,128** |
| 4. AMT | (75) | **1,195,092** |
| 5. Tax Rate Adj. | | **100,000** |
| Total | 254,401 | 1,907,545 |

That is, for tax year 1996, the report shows that Quaker State is entitled to a mark-to-market deduction, which has a tax reduction effect of

$232,050, and $22,426 of empowerment zone employment credits. A13. For the 1997 tax year, the report shows that Quaker State is entitled to refunds on account of $1,195,092 of AMT that it did not owe, additional tax credits of $183,325 and $429,128, as well as a computational adjustment of $100,000 when tax rates are applied under the regular tax rather than under the AMT. A13-15. The IRS Report is unequivocal on these points.

These findings are further supported by the Form 870 that the IRS prepared and the Joint Committee on Taxation worksheet that it prepared. Both of these documents, generated by the IRS, admit that Quaker State is entitled to refunds in the amounts of $254,401 for 1996 and $1,907,545 for 1997. *See Form 870 and JCT Worksheet at* A48-51. The affidavits of Kenneth Krch and Valerie Sutton, also show the same, and are contained in the Appendix for the Court's convenience. A3-4; A37-47. For example, they clearly show that the IRS Report correctly found that Quaker State was not subject to the AMT and is entitled to the corresponding refunds identified above. *Id.*

Accordingly, unless Defendant, in its opposition, submits significant probative evidence that the testimony of Kenneth Krch and Valerie Sutton

are incorrect and that the IRS's own findings and conclusions are wrong, Quaker State is entitled to summary judgment.[9]

## III. The IRS Is Correct That Quaker State Overstated its 1997 Federal Income Taxes in The Amount Of $1,907,545.

### A. Introduction to the ACE Adjustment[10]

Under the U.S. tax system, corporate taxpayers conduct two tax computations: One for the regular income tax and one for the alternative minimum tax ("AMT"). The taxpayer then pays the regular tax plus the amount, if any, by which the AMT exceeds the regular tax. In computing the AMT, the taxpayer basically starts with the same gross income as in computing the regular tax, but certain deductions and tax credits that reduce the regular tax do not reduce the AMT. There are also other formula, some of them quite complicated, that are aimed to ensure that the AMT hits the

---

[9] The Court, thus, may stop here. Nothing further needs to be said. Nevertheless, for the Court's interest, each item in issue is discussed at greater length below. Quaker State further notes that in the event the Court denies or postpones judgment on this motion, Quaker State reserves the right to explore whether Defendant is estopped from arguing that the audit adjustments are incorrect. Defendant repeatedly led Quaker State to believe it did not dispute the refunds. At the conclusion of the audit, it issued an agreed audit report, prepared Form 870 and a worksheet to submit the agreed audit report to the Joint Committee on Taxation; and later, Defendant's counsel told Quaker State that the computation specialist in the Department of Justice agrees with the refund computations; Defendant's counsel also told Quaker State that in fact the matter was submitted to the Joint Committee on Taxation. Quaker State reasonably relied on these representations and thus Defendant may now be estopped from taking them back.

[10] This section is provided to give the Court some background information on the ACE, however, it is academic to the outcome of the case.

taxpayers it targets. One of these formulae is the Adjusted Current Earnings ("ACE") adjustment.

The ACE adjustment was introduced in 1990 to help the AMT capture situations where taxpayers have significant positive earnings under financial accounting rules but losses under tax accounting principles. The ACE, thus, serves as a sort of proxy for financial earnings; but it is computed under tax accounting principles. It in fact replaced a formula that actually used financial reporting data; Congress replaced the previous formula (which operated from 1987-1989) with the ACE formula because it believed using income tax principles would facilitate its integration into the general AMT system. *See* Mertens, LAWS OF FEDERAL INCOME TAXATION, §2A:109.

Conceptually, the ACE provides a comparison between the AMT, without adjustment for the ACE, against the ACE (thus, loosely speaking, comparing the AMT to financial income). If the ACE is greater, then the AMT is increased under a formula to bring the AMT more in line with a tax on financial earnings. If, on the other hand, the ACE is less than the AMT, then the ACE can actually reduce the AMT if the overall ACE adjustments in the prior years (i.e., the cumulative ACE) is greater than the ACE in the current year. This helps ameliorate or eliminate the AMT when, over time, the taxpayer has been paying taxes commensurate with financial earnings.

Thus, potentially, the ACE can even reduce the AMT to zero, rendering it inapplicable. This is what happened here.

**B. Quaker State's ACE Adjustment Should Reflect A Negative $6,319,418.**

For the 1997 tax year, when Quaker State filed its Form 1139, which carried back the NOL from 1998, Quaker State reported that the NOL placed Quaker State in an AMT position. A4; A14-16. As a result, Quaker State paid AMT in the amount of $1,195,091. A54. In actuality, however, Quaker State was not in an AMT position. On its Form 4626, which shows the AMT computation, Quaker State had mistakenly left blank lines 4(d) and 4(e) relating to the ACE adjustment (leaving a line blank renders it a zero). A4; A14-16; A38. Line 4(d) should have shown an amount not less than $13,501,114, and line 4(e) should have shown a negative $6,319,418. *Id.* If these corrected entries are included, Quaker State would not be subject to the AMT. *Id.*

This matter should be uncontroverted. Under Treasury regulation 1.56(g)-1(a)(2)(i), the AMT is decreased by 75% of the excess of pre-adjustment AMT income over the ACE. Here, there is no genuine dispute that pre-adjustment AMT income is $63,625,729 and the ACE is $55,199,838. A4; A14-16; A38. Accordingly, the excess of pre-adjustment AMT income over the ACE is $8,425,891, and 75% of that is $6,319,418.

The IRS Report, and the affidavits of Kenneth Krch and Valerie Sutton, are all consistent on these points. A4; A14-16; A38. Furthermore, since this ACE adjustment reduces the AMT, it is reflected as a negative $6,319,418 on line 4(e) of Form 4626. *Id.*

Further, the potential limitation on negative ACE adjustments, found at Treasury regulation 1.56(g)-1(a)(2)(ii), is not triggered. This limitation applies only if the "current ACE adjustment" (i.e., 75% of the excess of pre-adjustment AMT income over the ACE, as computed in the previous paragraph) exceeds the "cumulative ACE" (i.e., the aggregate ACE adjustment increases in AMT income in prior years over the aggregate ACE adjustment decreases in AMT income in prior years). Here, there is no genuine dispute that the current ACE adjustment is $6,319,418, and that this amount does not exceed the cumulative ACE ($13,501,114, per the IRS Report). A4; A14-16; A38. Thus, the limitation is inapplicable.

Finally, as the computation contained in the IRS Report demonstrates, and the Krch and Sutton affidavits confirm, the negative $6,319,418 on line 4(e) removes Quaker State from the AMT for tax year 1997. A4; A8-31; A38; A50-51.[11]

---

[11] Quaker State notes that the Department of Justice computation specialist also reviewed these items and Defendant's counsel has indicated that the specialist agrees with the computations. A132.

**C. Because Quaker State Was Not Subject To The AMT, Quaker State Is Entitled To A Refund Of The AMT Payment And May Claim Certain Tax Credits Not Previously Taken.**

Once the ACE adjustment properly reflects a negative $6,319,418, Quaker State is no longer in an AMT position. *Id.* From this, several further computational consequences follow. First, since Quaker State is not in an AMT position, the $1,195,091 of AMT that Quaker State paid should be refunded. *Id.*

In addition, the fact that Quaker State is not in an AMT position impacts certain tax credits. On Quaker State's original Federal income tax return for 1997, Quaker State reduced its taxes for $612,453 of empowerment zone employment credits and unconventional fuel credits. A42; A46; A94. However, when Quaker State filed its Form 1139, and mistakenly believed that it was in an AMT position, it did not take these credits, under the belief that these credits were not allowed under the AMT. *Id.* Now that it is established that Quaker State is not subject to the AMT for 1997, there is no genuine dispute that Quaker State is entitled to the credits that it had originally reported. Indeed, the IRS has never disputed Quaker State's right to claim these credits.

Together, the credits for 1997 in the amount of $612,453 and the $1,195,091 of AMT equals a total refund due of $1,807,545 for 1997. A4;

A13; A42-43. In addition, when tax rates are correctly applied, there is an additional refund of $100,000 (the original computation had applied a flat rate rather than a graduated rate, which accounts for the additional amount). *Id.* The IRS has never disputed that the graduated rate should apply and has never contested Quaker State's right to recover this additional amount, either. This brings the total refund to $1,907,545.[12]

The IRS Report, and the affidavits of Kenneth Krch and Valerie Sutton are all consistent on these points, and there are no disputed material facts that would preclude summary judgment.[13]

## III. The IRS Correctly Concluded That Quaker State Overstated Its 1996 Federal Income Taxes In The Amount Of $254,401.

### A. Quaker State Is Entitled To A $663,000 Deduction Due To Marking to Market Its Accounts Receivable.

In general, taxpayers recognize gain or loss on securities upon their actual disposition, and not before. An exception to this rule is a method of accounting known as "mark-to-market" under 26 U.S.C. §475, which basically requires a taxpayer to recognize the gain or loss of securities at the end of each year, even if such securities are still held in the taxpayer's

[12] Note further that these amounts are not dependent on the NOL carryback. Even if the NOL were $0 (rather than $51,116,573, as in reality it is), Quaker State still would not be in an AMT position and thus the amounts here would reduce Quaker State's tax liability. A41-42; *see supra at p.7.*

[13] The Department of Justice computation specialist also reviewed these items and Defendant's counsel has indicated that the specialist agrees with the computations. A132.

portfolio. Such an accounting method is optional under §475 for taxpayers who are not dealers in securities and who elect this method for specific types of accounts that are eligible. Quaker State elected this method for certain accounts receivable that were eligible for this treatment under §475. A63-64.

The IRS has consented to this method of accounting for Quaker State's accounts receivable, and for years prior to 1996, the IRS agreed with the resulting deductions Quaker State claimed. *See, e.g., IRS Report at* A11 (explaining that for 1994 and 1995 Quaker State claimed these deductions and the IRS in those instances allowed the deductions). In fact, for 1994 and 1995, this item was audited and reviewed by the IRS's Financial Products Specialist, who agreed with Quaker State's accounting treatment and computation of deductions. *See IRS Form 5701, at* A133.

Consistent with this, for the 1996 tax year, Quaker State computed ordinary losses of $663,000 due to its mark-to-market of accounts receivable. There is no reason to treat 1996 differently than previous years. On audit, the IRS confirmed the $663,000 amount and agreed with the §475 treatment. The IRS Report states: "The Form 1120X for 1996 filed by the Taxpayer increasing expenses by $663,000 is determined to be allowable and is consistent with the treatment of this issue in the two prior years and in

the subsequent year." A11. The affidavit of Valerie Sutton concurs with this determination. A38.[14] There is no summary judgment evidence to the contrary.

Quaker State further notes that Defendant should be bound by the IRS's previous findings that the $663,000 deduction was proper. If Defendant now takes the position that Quaker State is not entitled to the deduction, there would be equitable estoppel and equitable recoupment issues, because the deductions resulted in corresponding and commensurate increases in income in later years. Specifically, while Quaker State reported the $663,000 loss for its 1996 tax year, under 26 U.S.C. §481 this entire amount was taxed as income during years 1999-2001. A11; A38. Thus, over time this issue is zero-sum, because the IRS has already taxed Quaker State for a $663,000 increase in income during 1999-2001. The IRS has consented to this treatment and taxpayer has relied on it. If Defendant contests Quaker State's right to the adjustment here, it will be taking a position inconsistent with the correlative years and whipsawing the taxpayer.

[14] The Department of Justice computation specialist also reviewed these items and Defendant's counsel has indicated that the specialist agrees with the computations. A132.

**B. Quaker State Is Entitled To $22,426 In Empowerment Zone Employment Credits.**

When Quaker State filed its original Federal income tax return for 1996, it qualified for and reported $22,426 in empowerment zone employment credits, along with $1,378,176 in other credits (including foreign tax credits and unconventional fuel credits). A62. But when the NOL from 1998 was carried back, Quaker State mistakenly reported on its Form 1139 that the AMT prevented it from taking all of these credits. A62. However, 26 U.S.C. §38(c)(2) provides a specific exception from the AMT for empowerment zone employment credits. Accordingly, the AMT for 1996 does not cap the $22,426 in empowerment zone employment credits, as the IRS Report states. A13; *see also, Sutton Affidavit at* A38. Once again, the IRS has never before disputed Quaker State's right to claim this credit and has admitted on several occasions that Quaker State is entitled to this amount.

**C. The Mark To Market Deduction and the Empowerment Zone Employment Credits Result In A $254,401 Overstatement Of Quaker State's 1996 Federal Income Taxes.**

The attached affidavits and accompanying worksheets illustrate the tax computation, as do the IRS Report and the IRS's JCT Worksheet. Basically, they reflect that the $663,000 deduction yields a tax refund of $232,050, and when the credits are added to that ($232,050 + $22,425) the

total is $254,475. A13; A42; A50. The IRS on audit, however, increased the AMT by $75 when the computation was re-run, which reduced the total to $245,401 (there is a $1 discrepancy due to rounding). The IRS Report and the Krch and Sutton affidavits are all consistent on these points. Once again, there is no genuine dispute that this calculation is correct.[15]

## II. Defendant's Alleged Offsets Are Without Basis In Law Or Fact And Thus Defendant Cannot Offset Quaker State's Overpayment.

Defendant’s Answer purports to assert that Defendant may be entitled to certain offsets. Before addressing the merits of the offsets, Quaker State notes that in order for offsets to properly come before the Court, Defendant must raise the offsets in a timely manner and produce concrete, positive evidence that they are supported both in law and fact.

*Mahoney v. U.S.* held that Defendant may not raise an offset or even take discovery regarding an offset unless it first comes forward with positive, concrete evidence to support the offsets. *Mahoney v. U.S.*, 223 Ct. Cl. 713 (1980) (refusing to allow discovery on offset issues for which Defendant failed to demonstrate legitimacy through positive, concrete proof, and dismissing such offsets in the absence of such proof). Unless Defendant, in its opposition, identifies specific issues and makes the

[15] The Department of Justice computation specialist also reviewed these items and Defendant's counsel has indicated that the specialist agrees with the computations. A132.

required threshold evidentiary showing under *Mahoney* (i.e., attaches summary judgment evidence that rises to the level of concrete, positive proof), Quaker State is entitled to judgment as a matter of law that there are no further issues that may reduce the refund Quaker State claims.

Furthermore, Defendant must establish that any offsets now raised are not tardy. In connection with Part I of this case, involving the §1341 issues, Defendant asserted its right to raise offset issues for tax years 1996 and 1997 and had its opportunity but failed to raise such offsets. *See, e.g., Transcript (1/21/03) at p.11.* While Part II of this case involves issues for the same tax years that were expressly carved out from Part I of the case, the issue of offsets was never carved out from Part I of the case, meaning that any offsets should have been raised during Part I. Therefore, to the extent Defendant now seeks to raise offset issues that it already had an opportunity to raise in Part I of the case, it must show why it should be given a second bite at this apple.

**A. The §453A Installment Sale Offset Is Without Merit and Cannot Survive Summary Judgment.**

Under 26 U.S.C. §453A(c), when a taxpayer uses the installment method to account for a sale (that is, the taxpayer includes the gain on a sale in income over a period of years as payments are received, rather than all in year one when the sale is consummated), the taxpayer generally must pay

interest on the deferred amounts. In 1992, Quaker State sold a coal contract with Buckeye Power Company to Arch Mineral Corporation and elected installment sale treatment. A39. Defendant alleges that for the 1996 and 1997 tax years, Quaker State failed to pay interest on this installment sale pursuant to §453A. Defendant's contention is without merit.

Section 453A(c) provides that interest is imposed on installment obligations if the obligation remains "outstanding as of the close of the taxable year." Here, Quaker State received the final installment on its sale of the coal contract in 1996. *Id.* Since all installments had been received and included in income by the conclusion of the 1996 tax year, there was no amount "outstanding as of the close of the taxable year." As a result, there was no deferred amount in 1996 (or in 1997) and no interest under §453A. Defendant has furnished no evidence demonstrating even a good faith basis for this accusation, let alone positive, concrete evidence as it is required to show under *Mahoney v. U.S.*, 223 Ct. Cl. 713 (1980).

Accordingly, the Court should grant summary judgment in favor of Quaker State on this issue.

**B. There Are No Other Offsets Or Other Issues That Stand In The Way of Summary Judgment Or Otherwise Remain Relevant to These Proceedings.**

Defendant has not pled or otherwise raised any further offsets or other issues that would purport to reduce Quaker State's refund. However, Defendant has suggested that to the extent the issues presented depend upon the correctness of the 1998 NOL, the correctness of the NOL must be proved. As explained above, the items presented do not depend on the correctness of the 1998 NOL, which has no bearing on this motion. *See supra at p.7.* To recapitulate, Quaker State has already received the benefit of the 1998 NOL and its corresponding deductions. Quaker State does not seek favorable adjustments to taxable income on the basis of the NOL deductions. Instead, it seeks the benefit of other adjustments to its tax liability based on the mark-to-market adjustment and on the erroneous application of the AMT to the 1996 and 1997 tax years.

As Exhibit AA demonstrates, Quaker State is entitled to the benefit of these adjustments with or without the 1998 NOL. A41-42. The exhibit's side-by-side comparison depicts this. It shows that before the Form 1139 was filed (and before Quaker State incurred the NOL for 1998), Quaker State was entitled to the items in issue. *See right side of Exhibit AA, at* A41-42. They were all claimed on either the original Federal income tax return

or on the Form 1120X, which amended the original Federal income tax return. The exhibit further shows that after Quaker State incurred the 1998 NOL, Quaker State was still entitled to these amounts. *See left side of Exhibit AA, at* A41-42. Accordingly, Quaker State is entitled to the adjustments at issue with or without the 1998 NOL, and thus the 1998 NOL is computationally separate and apart from the adjustments on which Quaker State basis the refund *sub judice*. *Id.*

Accordingly, the only way the NOL could theoretically come into play is if Defendant properly raises it as an offset. To do so, Defendant would have to identify specific aspects of the NOL that would give rise to an increase in Quaker State's 1996 and/or 1997 tax liability. Unsupported, conclusory assertions that the NOL is wrong will not suffice. Just as a taxpayer cannot file a refund claim that baldly asserts, with no factual support or specificity, that a refund is due for a certain year or that a tax return overstates income for a certain year, Defendant cannot simply say that an NOL for a certain year is overstated. It must state with specificity the item and reason the NOL is incorrect. Further, Defendant must produce positive, concrete evidence to support any specific offsets it asserts. *See Mahoney v. U.S.*, 223 Ct. Cl. 713 (1980). So far, Defendant has done neither. To the contrary, the IRS concluded during its audit that the NOL is

correct and has never once suggested otherwise during the three years between the close of the audit and the filing of its amended Answer.

Moreover, even if the 1998 NOL were before the Court, there is sufficient summary judgment evidence to conclude that the 1998 NOL and the corresponding deductions are correct.[16] First, the IRS has determined and admitted that the 1998 NOL reported on Quaker State's Form 1139, and the corresponding NOL deductions in tax years 1996 and 1997, are correct. The IRS audited these items, then prepared and signed reports attesting to their correctness. *See IRS Report at* A6; A12*; Forms 5701* at A145*; Form 870 at* A48*; JCT Worksheet at* A50. The IRS then deliberately allowed the statute of limitations to expire, *see supra note 3,* thus waiving its right to later contest their correctness.[17]

Accordingly, the 1998 NOL is not an issue presented, and even if it was, there is no genuine dispute that Quaker State incurred an $88,176,435 NOL for 1998 and that it correctly carried back the amounts of the NOL to its 1996 and 1997 tax years. Any attempt to raise this issue now would be

---

[16] Note that, arguably, Defendant would have the burden of proof that the refund it issued for the 1998 NOL was erroneous, see, e.g., *United States v. Commercial Nat. Bank,* 874 F.2d 1165, 1169 (7th Cir. 1989), and thus it bears the initial burden on summary judgment too. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). But even if Quaker State bears the initial burden, it easily satisfies it, as explained in the following text.

[17] Note also that, arguably, this determination carries a presumption of correctness. See, e.g., *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Note also that this determination is further confirmed by the Sutton affidavit, attached at A37-39.

nothing more than a dilatory effort to further postpone Quaker State's long-overdue refund.

**V. The Court Should Not Delay Its Decision On This Motion On Account Of Defendant's Plea That It Needs More Time To Develop The Issues.**

Given that Defendant has had more than five years to investigate Quaker State's claims and request whatever information it needed, there is no basis for Defendant to seek more time for discovery.

Under Rule 56(f), if Defendant seeks to delay entry of summary judgment on grounds that it needs more time to gather information, it must attest with specificity in an affidavit: (1) the particular information sought; (2) how, if uncovered, the information would preclude summary judgment; (3) the factual basis for the Defendant's belief that such information exists; (4) the efforts previously made to obtain such information, and (5) why such information has not previously been obtained. *See, e.g., Brubaker Amusement Co. v. U.S.*, 304 F.3d 1349, 1361 (Fed. Cir. 2002), *cert. denied sub nom. Penn Triple S v. U.S.*, 538 U.S. 921 (2003); *New America Shipbuilders, Inc. v. U.S.*, 871 F.2d 1077, 1081 (Fed. Cir. 1989); *Theisen Vending Co. v. U.S.*, 58 Fed. Cl. 194, 198 (2003). Thus, to meet its Rule 56(f) burden, Defendant must be specific about the information sought and

explain precisely why it was not obtained during the five-year period preceding this Motion.

Defendant is incapable of meeting these requirements. First, there is no reason to believe that any additional information requested by Defendant would preclude Quaker State's right to summary judgment for the refunds claimed herein, given Defendant's repeated admissions that the refunds are correct. *See IRS Report at* A6; A12*; Forms 5701* at A140-150*; Form 870 at* A48*; JCT Spreadsheet at* A50. Second, Defendant had ample opportunity to request any information it needed during both the two-year audit and the three years that elapsed between the end of the audit and the filing of this Action, during which time Defendant claimed to be "processing" Quaker State's settlement offer. A130-132.

Quaker State has been fully cooperative throughout its dealings with Defendant. In fact during the two years when Defendant was supposedly considering the settlement offer, Quaker State regularly asked Defendant if there was any additional information Defendant needed from Quaker State to evaluate the offer. Defendant did not request any information from Quaker State during that time. In May 2005, and again three days before Defendant filed its amended Answer, Defendant finally made two requests for information. Quaker State promptly responded to both requests and

provided the information sought, which further corroborated the refund's correctness. Defendant has no grounds on which to assert that Quaker State was uncooperative at any stage in this proceeding.

Allowing Defendant even more time than the five-plus years it already had to seek information from Quaker State will frustrate the interests of justice and force Quaker State to incur needless discovery costs, merely to delay the inevitable. There is no reason to believe that allowing Defendant additional time to request information will bear any fruit. On the other hand, forcing Quaker State (and its attorney) to pour over discovery requests, sift through boxes of documents spanning the early to late 1990's, and prepare for and travel to depositions will undoubtedly drive up the cost of this litigation, tax Quaker State's resources, and further delay resolution of this Action. Any request by Defendant for more information at this late date would be nothing more than a delay tactic.

In short, allowing further delay would thwart justice, subject Quaker State to needless and costly discovery, and would simply postpone the inevitable. It is time to bring this litigation to an end and grant summary judgment to Quaker State.

## CONCLUSION

Defendant has had five years to develop this case—two years on the audit and three years when it was supposedly considering Quaker State's refund and settlement offer. During this time, Defendant has not unearthed a single fact that would cast any doubt on the propriety of the refunds claimed by Quaker State—refunds that Defendant admitted were due and owing to Quaker State during the IRS's own audit and on numerous occasions thereafter. There is no just reason to further prolong this matter.

The Court should grant the motion for summary judgment and find that Quaker State is entitled to a refund of Federal income taxes in the amounts of $254,401 for 1996 and $1,907,545 for 1997, in addition to the $111,392 for 1995 and $112,621 for 1996, which the parties have previously agreed to in connection with the Court's Opinion filed October 28, 2004.

Respectfully submitted,

s/Peter A. Lowy

Date: August 30, 2005

PETER A. LOWY
910 Louisiana St.
Ste 4396
Houston, Texas 77002
(713) 241-4755 (telephone)
(713) 241-2162 (facsimile)

Attorney for Plaintiff